**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JACQUELINE CLAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 15 C 6287** |
| | ) | |
| **NATIONAL RAILROAD PASSENGER** | ) | |
| **CORPORATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Jacqueline Clay filed a seven-count complaint against National Railroad

Passenger Corporation (Amtrak) and three Amtrak managers, Denyse Nelson-Burney,

Keren Rabin, and Donna Peterkin, alleging that her employment with Amtrak was

terminated and she was otherwise discriminated against on improper grounds. Amtrak

denies these allegations and now moves for summary judgment on all of Clay's claims.

### Background

Clay is a former Amtrak employee who was based at Amtrak's office in Chicago.

Clay began working at Amtrak in 2000 as an equal employment opportunity (EEO)

manager in Amtrak's dispute resolution office (DRO). She was responsible for

addressing passenger complaints and internal complaints of discrimination. During

Clay's tenure at Amtrak, she worked under three different EEO directors: Thomas

Campbell from 2000-2012, Lisa Coleman from 2012 to mid-2013, and defendant Donna

Peterkin from late 2013 up until Clay's termination in 2014. Throughout Clay's tenure at

Amtrak, her direct supervisor would report to the Department's Manager—a position defendant Denyse Nelson-Burney held from 2001 to 2015.  Defendant Keren Rabin served as senior associate general counsel in the EEO department from 2012 to 2014.

In 2011, Amtrak dissolved its dispute resolution office.  Some of the office's responsibilities were transferred to the EEO department, resulting in Amtrak abolishing the position Clay held in the DRO.  Amtrak informed the former DRO EEO managers that they could apply for the position of EEO officer in the EEO department.  Clay did so, and, at the age of 50, she was rehired by Nelson-Burney and Campbell as an EEO officer.

As an EEO officer, Clay continued to work under the direct supervision of Campbell, who continued to report to Nelson-Burney.  Clay's duties as an EEO officer did not change substantially from her position in the DRO.  She was tasked with addressing internal complaints under the supervision of Campbell and with writing position statements on behalf of Amtrak to the Equal Employment Opportunity Commission under the supervision of Nelson-Burney.  Campbell explained that these "were different reports and [had] different standards," describing the EEOC position statements as complex and having standards that were "a lot more stringent than internal complaints and passenger complaints."  Pl.'s Resp., Ex. 7 (Campbell Dep.) at 98:18-99:22.

In both of her positions, Clay consistently received "meets expectations" ratings in her annual performance reviews from 2000 to 2012.  Defs.' Mot. for Summ. J., Exs. 2, 3.  For example, in Clay's 2011 evaluation, Campbell wrote that Clay had "good analytical skills" and "a good ability to synthesize complex and diverse information."

Defs. Mot. for Summ. J., Ex. 2 at 1-2. He said, however, that although Clay's "research skills generally enable[d] her to collect relevant data," sometimes she did not "gather all the information necessary to produce a complete picture." *Id.* at 2. Nonetheless, Campbell wrote that Clay "made a tremendous contribution to the success of the EEO Department." *Id.* at 11. Similarly, in his 2012 review of Clay, Campbell wrote that Clay was a "valuable member of the EEO Compliance Unit." Defs.' Mot. for Summ. J., Ex. 3 at 2. He also stated, however, that "Clay need[ed] to take her writing skills to the next level." *Id.* (Campbell said this line was inserted by Nelson-Burney and that he did not agree with the statement). Campbell Dep. 64:4-65:20.

During Clay's tenure at Amtrak, Amtrak and the EEO department experienced several changes. First, Amtrak faced financial difficulties. A 2010 report by the Office of Inspector General criticized Amtrak's five-year plan for failing to include a section on "Amtrak's strategy for managing its aging workforce." Pl.'s Resp., Ex. 29B at 8. Amtrak's annual report to Congress for 2012 stated that its "current Financial Plan indicates that there are risks to Amtrak's financial stability due to factors such as employee health care costs and volatile fuel prices" and that its "projections for operating losses increase . . . mainly due to growing expenditures on salaries, wages, and benefits." Pl.'s Resp., Ex. 29 at 3 ¶ 1, 4 ¶ 1. And in 2013, Amtrak's president stated that "[t]hrough February of [fiscal year 2014], Amtrak's total payroll (including all benefits and taxes) is 93.6% of Amtrak's ticket revenue. The company cannot sustain this level of payroll or overtime going forward . . . ." Pl.'s Resp., Ex. 25.

In the EEO department, there was a concerted effort to increase the quality of its work product and to reduce its costs. On September 25, 2013, Nelson-Burney

distributed the EEO compliance unit strategic plan, which stated that Amtrak was "moving towards a competency-based performance system" and set a department goal of "increasing the quality of position statements."  Defs.' Mot. for Summ. J., Ex. 40-F at 4.  She explained that the transition may be difficult, because "every aspect of [the EEO officers'] duties will be inspected, possibly recalibrated and measured."  *Id.*  A month later, Nelson-Burney announced a new procedure in annual performance reviews called a "calibration," "where department heads [would] meet to look at the suggested [annual] ratings and have discussions to make sure the ratings [were] fair, biases [were] controlled and employees [were] rated against each other (taking into account the size and difficulty of projects, barriers to success etc.)."  Pl.'s Resp., Ex. 5.  She cautioned that EEO officers "should be aware that [they] can meet all [their] goals but receive a poor rating if [they] do not adhere to Amtrak's values."  *Id.*  She also informed employees that their "preliminary rating can change depending on the conversations in the Calibration meetings."  *Id.*  The EEO officers who received "does not meet expectation" ratings would be placed on a performance improvement plan.  Pl.'s Ex. 9 (Rabin Dep.) at 106:5-16.

Following the EEO department's new initiative, Clay's ratings began to decline. On October 23, 2013, Coleman sent Nelson-Burney an e-mail with her preliminary evaluations of all EEO officers, including a "meets expectations" rating for Clay.  Defs.' Mot. for Summ. J., Ex. 39-F.  Under the "con" section of her evaluation of Clay, Coleman wrote that Clay "continues to be inconsistent in her writing proficiency . . . . sometimes does not exhibit a clear understanding of developments in the law . . . [and is] tardy in submitting assignments."  *Id.*  On October 29, 2013, a calibration session

involving Clay was held with Amtrak's managing deputy general counsel William Herrmann, human capital business partner Juanita Thorne, Nelson-Burney, and Coleman. Coleman testified that "when we went in [the calibration session,] [Clay] met expectations. When we left, she didn't meet expectations." Pl.'s Resp., Ex. 8 (Coleman Dep.) at 251:1-9. Indeed, Clay's final evaluation stated that she did not meet expectations overall, despite the fact that she met expectations in eight of the nine categories listed in the performance evaluation form. The one category in which Clay did not meet expectations was writing. The final evaluation stated that Clay's "writing skills continue to fall below appropriate standards in composition, organization and sophistication" and that her "position papers sometimes require significant revision." Defs.' Mot. for Summ. J., Ex. 33 at 1.

On November 29, 2013, Nelson-Burney made the decision to place Clay on a performance improvement plan (PIP), citing the following as areas of concern: "Inadequate, incomplete and unsatisfactory investigative reports and position statements" and "[m]issed deadlines without adequate reason." Defs.' Mot. for Summ. J., Ex. 11 at 1. Coleman testified that she disagreed with the decision to place Clay on a PIP and told Nelson-Burney that she did not agree that "people who had good performance evaluations for years should be on a PIP without having some previous . . . knowledge that their work was [in]sufficient." Coleman Dep. at 241:24-242:7. Coleman also stated that she had "no reason to think that there was a performance issue" regarding Clay's work product. *Id.* at 242:1-7. Likewise, Clay disagreed with the decision to place her on a PIP. She wrote in a rebuttal that she felt that her "rating [was] inappropriate," and she asked for revised performance rating. Pl.'s Resp., Ex. 55 at 2.

She wrote that she had "shown [her] commitment to [the EEO department] by adjusting [her] schedule and even participating in a mandatory conference call while on approved FMLA" leave. *Id.* Nonetheless, Clay remained on a PIP.

Clay's PIP stated: "Improvement in your performance must begin immediately . . . . Failure to demonstrate immediate and sustained improvement . . . will result in further corrective or disciplinary action, up to and including termination prior to 90 days." Defs.' Mot. for Summ. J., Ex. 11 at 2. Nelson-Burney also wrote: "In conjunction with the above PIP, I want to provide you an opportunity to improve your performance and I am committed to working closely with you. Therefore, we will meet on a biweekly basis to discuss your progress on meeting acceptable performance standards and to provide you with feedback." *Id.* On March 4, 2014, Clay's progress was assessed. Management concluded that although Clay improved in critical areas such as writing, she still was not meeting expectations. In deciding whether to take "corrective action" or extend the PIP, Amtrak senior associate general counsel Rabin determined to place Clay on an extended three-month PIP. Rabin wrote that she wanted to give Clay "enough time to demonstrate sufficient improvement." Defs.' Mot. for Summ. J., Ex. 41-K.

The EEO department also made changes in response to Amtrak's financial concerns. Nelson-Burney commented that Amtrak was making a "switch to running [the company] more like a business instead of like the government . . . ." Pl.'s Resp., Ex. 12 (Nelson-Burney Dep.) at 118:18-119:4. She elaborated that "Amtrak had a reputation of lax performance standards. And, frankly, the longer you sat in the seat you just got to sit there for thirty years. And so [Amtrak] wanted to change [to be] able to retain and

attract high level candidates and just keep really good people around and increase the levels of performance . . . ." *Id.* at 119:9-17.

Nelson-Burney sent the EEO department an e-mail detailing the department's goals for fiscal year 2014. She described a new policy that she said was aimed at mitigating Amtrak's legal exposure. Under this policy, the EEO department was tasked with creating strategies that would increase "the number of complainants utilizing the [Amtrak] internal process before moving on to a federal/state agency." Pl.'s Resp., Ex. 53 at 2. Clay testified that Nelson-Burney asked her and other EEO officers to "mingle with the employees" who filed external complaints in order to "find out what's going on," and that maybe through their interactions the EEO officers could "head off any complaints." Pl.'s Resp., Ex. 4 (Clay Dep.) at 66:4-13. Clay and two other EEO officers, Elias Munoz and Erick Mitchell, protested that, in their view, the new policy was illegal. Clay told EEO management that she "didn't agree" with the policy because it "wasn't for [EEO officers] to try to persuade [employees] to come internally [because it] was [the individual employee's] personal decision." *Id.* at 109:22-110:1. Nonetheless, Clay complied with the policy and engaged with employees when she saw them outside of the office. *Id.* at 115:3-10.

Another goal that Nelson-Burney established to reduce Amtrak's costs was to create an "EEO Compliance webinar series." Defs.' Mot. for Summ. J., Ex. 35 at 2. EEO management subsequently arranged a webinar on drafting position statements. Clay could not log into the webinar because EEO management only paid for one login for one Amtrak location instead of all of its locations, including Chicago where Clay was based. In response, management decided to download the webinar slides and

distribute them to the off-site EEO officers because otherwise Amtrak "would have to pay an additional $225.00 per additional site."  Rabin Dep., 84:1-14.  Management then told the EEO officers to put their phones on mute so that the webinar's producers would now know that multiple officers were listening despite the single login purchase.  Clay testified that she complained to coworkers because she believed management's directions violated copyright laws.  Clay participated in the webinar nonetheless.

Also in 2014, the EEO department hired Peterkin for the position of director of EEO compliance.  Peterkin became Clay's direct supervisor.  Shortly after Peterkin joined the department, Clay's time management became an area of concern.  On March 17, 2014, Peterkin asked Clay what her work hours and leave plans were.  Defs.' Mot. for Summ. J., Ex. 40-A.  Clay responded that beginning in 2010, Amtrak had approved Clay's annual requests for intermittent leave under the Family and Medical Leave Act (FMLA) to care for her husband, with her latest approval extending to the beginning of 2015.  *Id.*  A month later, Peterkin sent an e-mail to the EEO officers in which he stated that if an officer intended to use leave, the officer must provide her with proper notice in advance and that if an officer takes leave that "[was] not approved ahead of time, [the officer] may be charged with leave without pay."  Defs.' Mot. for Summ. J., Ex. 40-B.

After several complaints that Clay was missing deadlines, Peterkin gave Clay a verbal warning, documented in a letter dated May 1, 2014.  Peterkin stated:  "Your conduct of missing deadlines without speaking up or seeking an extension is not an isolated matter . . . .  Missing deadlines is unacceptable and places the company at risk . . . .  I want to provide you with an opportunity to improve your performance and I am committed to working closely with you."  Defs.' Mot. for Summ. J., Ex. 26.

In Clay's 2014 performance review, Peterkin highlighted Clay's time management issues in six of the ten areas of review. Under the heading investigative skills, Peterkin wrote: "[Y]ou do not timely investigate cases and your productivity in terms of completing investigations is low." Defs.' Mot. for Summ. J., Ex. 40-K at 6. Under case management skills, Peterkin wrote: "While you routinely update your case status, you still manage to miss deadliness and offer no explanation in doing so." *Id.* Under writing skills, Peterkin wrote, "It is believed that you are making an effort to improve your investigation reports. However, your reports are still in need of significant improvement. Additionally, when you are given feedback, you take a significant amount of time to revise your reports rendering them untimely." *Id.* Under verbal skills, Peterkin wrote: "Your verbal skills are good. However, there are concerns with how you respond in weekly case status meetings when asked about delays in your investigations." *Id.* Under good judgment, Peterkin wrote: "You generally display good judgment, except when it comes to adhering to deadlines. You could further develop by closely monitoring your deadlines, timely identifying barriers to completing your investigations, and seeking timely extensions." *Id.* Finally, under time management, Peterkin wrote: "Missing deadlines for no known reason and then failing to provide a reasonable explanation is unacceptable. You were counseled in this area and it is expected that you will improve." *Id.*

When Clay was asked during her deposition whether "there [was] ever a point [when she] told [Peterkin] or anybody else that [she was] having trouble getting work done because of the responsibilities [she] had caring for [her] husband," she testified that "[she] told them [she had] a lot on [her] plate." Clay Dep. at 133:16-20.

On May 21, 2014, Rabin and Jeannette Higham, whose title was human capital business partner, advised Clay that she was being terminated due to poor performance. *Id.* at 235:8-9. Rabin, Peterkin, and Nelson-Burney, with approval by Herrmann, made the decision to terminate Clay's employment. Clay and her fellow EEO officer, Munoz, were terminated on the same day because Rabin believed it would be "less disruptive" for the Department. Rabin Dep. at 133:18-22. Erick Mitchell, Lisa Coleman, and Beth Genshaft all resigned within one year. *Id.* at 140:13-141:9. Nelson-Burney explained that "[p]retty much all of the officers and Lisa certainly was unhappy with Ms. Peterkin's style." Nelson-Burney Dep. at 206:9-15. Rabin's 2014 performance review for Peterkin stated that "[u]nfortunately, the director's methods and approach created significant friction and tension with several of the EEO staff members from very early on in her tenure." Rabin Dep. at 236:1-22.

Clay filed this lawsuit alleging that Amtrak retaliated against her for speaking out against its employment discrimination policy and its conduct in administering the webinar and that Amtrak also discriminated or retaliated against her on other bases. Clay asserts claims against Amtrak under 42 U.S.C. § 1983, the Family and Medical Leave Act, Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Illinois Whistleblower Act, and Illinois common law. Amtrak has moved for summary judgment on all of Clay's claims.

## Discussion

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir.

2010). Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment must be granted "[i]f no reasonable jury could find for the party opposing the motion." *Hedberg v. Ind. Bell. Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

## A.      Retaliation for exercise of First Amendment rights

Amtrak argues that Clay may not assert a claim under 42 U.S.C. § 1983 because Amtrak is not a state entity. There is some authority to the contrary, and also that Amtrak or its employees are subject to *Bivens* actions. *See Johns v. Amtrak Police Unit*, No. 07 C 530, 2009 WL 691281, at *8 (N.D. Ill. Mar. 16, 2009). The Court need not address this point, however, because Clay's First Amendment claim fails on the merits.

Clay contends that Amtrak terminated her employment because she spoke out against the policy of discouraging external complaints and the decision to have employees without the appropriate credentials participate in a webinar. To make out a prima facie case of retaliation for exercise of First Amendment rights, "a public employee must present evidence that: (1) [her] speech was constitutionally protected, (2) [she] has suffered a deprivation likely to deter free speech, and (3) [her] speech was at least a motivating factor in the employer's action." *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). Amtrak contends that Clay cannot prove that her speech was protected by the First Amendment.

11

First Amendment protection of speech by a public employee depends on "whether the employee spoke as a citizen on a matter of public concern," *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), the determination of which is a question of law. *See Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016). When a public employee makes a statement pursuant to her official duties, she is speaking as a citizen for First Amendment purposes. *Garcetti*, 547 U.S. at 421. "Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Kubiak*, 810 F.3d at 481 (7th Cir. 2016) (quoting *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)).

Clay's statements did, to be sure, implicate matters involving public concern. Clay believed that Amtrak's new policy of "mitigating [its] legal exposure" by reducing external complaints violated discrimination laws. Pl.'s Resp., Ex. 53 at 2. She told management that she opposed the policy because it "wasn't for [EEO officers] to try to persuade [employees] to come internally [because it] was [the individual employee's] personal decision." Clay Dep. at 109:22-110:1. Second, Clay believed that Amtrak violated copyright laws in connection with the webinar incident discussed previously. These maters implicate arguable malfeasance by governmental officials, which is, generally speaking, a matter of public concern. *See, e.g., Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 794 (7th Cir. 2016). Beyond this, it is rather obvious that a quasi-government agency's attempt to discourage employees from complaining about discrimination—if that is what the policy change was—would implicate a matter of public concern.

But Clay's statements, at least those involving the effort to discourage external EEO complaints, also were within Clay's official duties as an EEO officer. As an EEO officer, Clay was tasked with executing Amtrak's employment discrimination policies and assisting employees filing discrimination complaints. As such, any changes Amtrak made regarding its employment discrimination policies or how EEO officers execute those policies were necessarily linked to Clay's job duties. Here, of course, we are talking about Clay's complaint to management about the policy change, not about carrying out the change. But feedback about changes in job duties is quite obviously part of the responsibility of most employees, and that is what Clay did here—she expressed to management her opposition to the policy change.

The Court need not dwell long on Clay's complaints regarding the webinar; she does not even mention this point in the discussion of her First Amendment claim in her summary judgment response brief. *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. at 5-8. And for good reason: Clay made this complaint only to co-workers, not to management or anyone outside Amtrak. This episode cannot sustain Clay's First Amendment claim.

For these reasons, Amtrak is entitled to summary judgment on Clay's First Amendment claim.

**B.      Family and Medical Leave Act claims**

The FMLA prohibits an employer from interfering with or retaliating for an employee's use or attempted use of FMLA leave. 29 U.S.C. §§ 2615(a)(1), (2). The difference between the two types of claims is that an interference claim only requires the employee to prove that the employer denied her rights to which she was entitled

under the FMLA, whereas a retaliation claim requires the employee to prove discriminatory or retaliatory intent. *Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012).

Clay makes an (incomplete) argument that Amtrak interfered with her rights under the FMLA. To establish an interference claim, an employee must prove that: "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Id.* at 627. There is no dispute that Clay satisfies the first four requirements on an FMLA interference claim: she applied for and received intermittent FMLA leave to care for her spouse, who was suffering from a serious health condition. For the last requirement, however, it is also undisputed that Amtrak never denied Clay FMLA benefits. In fact, Amtrak approved every one of Clay's requests for FMLA leave from 2010 until 2014.

Clay also argues that Peterkin's requirement to provide advance notice before taking leave interfered with her ability to freely take FMLA leave. The Court disagrees. Although Peterkin required EEO officers to give her notice before taking leave, she also permitted officers to give her notice of leave after the fact so long as there was an adequate explanation for the employee's absence. Peterkin's leave procedures did not create an additional hurdle that Clay had to mount in order to take leave. In fact, these procedures conformed to the conditions of Clay's FMLA leave. Under the conditions set out in her FMLA approval, Clay was permitted to take one day a week off, with a requirement to give 24 to 48-hour advance notice. *See* Defs.' Mot. for Summ. J., Ex. 40-A. Likewise, if an emergency developed, Clay's was permitted to take leave without

notice and subsequently inform her direct supervisor as soon as she could. Neither of these conditions was altered or impaired by Peterkin's leave procedures. Moreover, there is no evidence that Peterkin used this policy against Clay or to deny Clay her FMLA leave. Peterkin explained that she simply wanted a procedure in place to document the whereabouts of her employees.

Clay also asserts that she and another EEO Officer, Munoz, were subjected to "heightened scrutiny, verbal warnings, and threats." Pl.'s Resp. at 8. Clay offers no evidence, however, that this resulted in a denial of FMLA leave or deterred her from taking leave to which she was entitled.

For these reasons, Clay cannot establish an interference claim.

The Court turns next to Clay's FMLA retaliation claim. To sustain an FMLA retaliation claim, a plaintiff must show that she engaged in a protected activity; her employer took an adverse employment action against her; and there is a causal connection between the two. *Pagel*, 695 F.3d at 626. It is undisputed that Clay meets the first and second elements of this claim; she took FMLA leave, and Amtrak terminated her employment. Amtrak argues, however, that Clay cannot establish the necessary causal connection.

Prior Seventh Circuit precedent called for courts to assess evidence of discrimination through two separate lenses: "direct" and "indirect" evidence. Recently, however, the Seventh Circuit jettisoned this somewhat artificial distinction, which at times required courts to assess the same evidence two different ways. Now, the court has said, the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that . . . [a] caused the discharge or other adverse employment

action."  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . ."  *Id.*

Clay's primary contention that her taking of FMLA leave led to her termination involves management's complaints about her time management.  Indeed, there is evidence that Nelson-Burney and Peterkin expressed frustration with Clay's management of her time.  As the standards in the EEO department were made more rigorous, Nelson-Burney was heard to say that the EEO officer position was "not a 40-hour a week job" and that working the minimum hours would cause an EEO officer to fall behind.  Pl.'s Resp., Ex. 3 (Clay Aff.) ¶¶ 87-89.  Peterkin was more direct.  After making several informal attempts to get Clay to meet deadlines, she eventually gave Clay a verbal warning.  Peterkin stated that Clay's "conduct of missing deadlines without speaking up or seeking an extension" was not an isolated matter and needed to be corrected.  Defs.' Mot. for Summ. J., Ex. 26.  And in Clay's 2014 performance review, Peterkin made negative comments about Clay's time management in six of the ten categories she reviewed.  For example, Peterkin wrote that while Clay showed progress in her writing skills, Clay took a "significant amount of time to revise [her] reports rendering them untimely."  Defs.' Ex. 40-J at 7.

No reasonable jury could find, however, that the complaints about Clay's use of her time had anything to do with her taking of FMLA leave.  Rather, they involved her apparent inability to get her work done in a timely fashion—at least based on the enhanced performance standards that the EEO department was attempting to establish. And Clay's inability to meet deadlines has been an issue throughout her time at Amtrak.

As early as 2012, two years before Clay's termination, Coleman wrote in a performance evaluation that Clay "continues to be inconsistent in her writing proficiency . . . . sometimes does not exhibit a clear understanding of developments in the law . . . [and is] *tardy in submitting assignments.*"  Defs.' Mot. for Summ. J., Ex. 39-F (emphasis added).  And to the extent that missing deadlines factored into Amtrak's decision to terminate Clay's employment, that would not be evidence from which a jury could find retaliation for taking FMLA leave.  First, Clay offers no evidence that her taking of FMLA leave had anything to do with why she missed deadlines or that this was perceived as the reason.[1]  Furthermore, she has offered no evidence that deadlines were imposed on her in a disparate manner or that her compliance with deadlines was assessed differently than for other EEO officers who did not take FMLA leave.

Clay also contends that management only began to complain about her the quality of her work product after she began to take FMLA leave.  But her only actual evidence in this regard is that some supervisors were satisfied with her work product even as Nelson-Burney and Peterkin contended her performance was less than satisfactory.  For example, in Campbell's 2012 performance evaluation of Clay, the only negative comments came from Nelson-Burney, who criticized Clay's writing skills.  Campbell disagreed with the criticism and testified that he did not have any problems with Clay's writing skills.  Campbell Dep. at 64:20-65:9.  Coleman also testified that she disagreed with the decision to place Clay on a PIP.  Coleman told Nelson-Burney that she did not agree that "people who had good performance evaluations for years should

---

[1] There is evidence that Clay told Nelson-Burney and Peterkin, "I have a lot on my plate," Clay Dep. at 133:20, which is far from telling them that she was missing deadlines because of issues related to taking FMLA leave.

be on a PIP without having some previous . . . knowledge that their work was [in]sufficient." Coleman Dep. at 241:24-242:7. She also stated that she had "no reason to think that there was a performance issue." *Id.* at 242:1-7.

In the Court's view, however, Clay's evidence that some supervisors were satisfied with her work does not give rise to a genuine factual dispute on the issue of a causal connection between her FMLA leave and her termination. Rather, the evidence is clear that Clay's termination was performance-based. The evidence establishes beyond dispute that Amtrak was making a concerted effort to increase the quality of the work from the EEO department. In 2013, Nelson-Burney informed the entire department that Amtrak was "moving towards a competency-based performance system" and that the transition may be difficult because "every aspect of [the EEO officers'] duties will be inspected, possibly recalibrated and measured." Defs.' Mot. for Summ. J., Ex. 40-F at 4. Perhaps, as Coleman's cited testimony suggests, Amtrak moved the goalposts when it came to evaluating the performance of EEO officers. But there is no evidence suggesting that the tougher standards were applied in a discriminatory manner based on Clay's taking of FMLA leave or, for that matter, any other legally prohibited basis. Indeed, the evidence reflects that Clay was given an opportunity to improve her performance. Nelson-Burney went beyond the PIP, advising Clay that "I want to provide you an opportunity to improve your performance and I am committed to working closely with you." Defs.' Mot. for Summ. J., Ex. 11 at 2. And when Clay's performance did not improve after 90 days on the PIP, she was not terminated; rather, Rabin extended the PIP by three months, saying that she wanted to

give Clay "enough time to demonstrate sufficient improvement." Defs.' Mot. for Summ. J., Ex. 41-K.

Ultimately, Clay was terminated only after a year-long opportunity to improve her work product. Clay may regard it as unfair that, after a long tenure as an EEO officer, she was terminated arguably not because her performance deteriorated but because it did not measure up to new, tougher standards imposed by new managers. But the imposition and enforcement of those standards does not amount to retaliatory or discriminatory conduct, particularly when Clay has offered no evidence that her performance was assessed under different standards, or in a different way, from that of other EEO officers. *See, e.g., Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989) ("An employer can set whatever performance standards he wants, provided they are not a mask for discrimination on forbidden grounds . . . .").

Finally, Clay contends that management mistreated EEO officers who took FMLA leave. She says that she and Munoz "were the only two Amtrak EEO officers who had used approved FMLA" and that they were also the only two officers who were put on PIPs and were subsequently terminated ostensibly for poor performance. Clay Aff. ¶ 100. This is the wrong sort of comparison to make in order to establish discriminatory or retaliatory conduct by an employer. Actually, it is not a comparison at all; Clay does not identify a similar employee *outside* her protected class (i.e., an EEO officer who was otherwise comparable but did not take FMLA leave) who was treated more favorably than she was. *See, e.g., Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Rather, what Clay is offering is more like a form of "pattern" evidence: workers with similar characteristics were all treated poorly. But two employees is not enough to

make a meaningful pattern.  No reasonable jury could draw from the evidence about only Clay and Munoz an inference that Clay was mistreated in retaliation for taking FMLA leave.  The Court also notes that the evidence reflects that another EEO officer, Steve Siebert, who took intermittent FMLA around the same time as Clay, was not put on a PIP or terminated, which further undermines Clay's attempt to show a pattern of poor treatment.  Defs.' Mot. for Summ. J., Ex. 42 (Siebert Decl.) ¶¶ 3, 16.

**C.      Age discrimination claim**

Clay asserted a claim of age discrimination in her complaint.  Amtrak moved for summary judgment on this claim, arguing that Clay cannot muster either direct or indirect proof that she was terminated due to her age.  Clay did not respond; indeed she made no mention of her age discrimination claim in her summary judgment response brief.  The Court agrees with Amtrak that Clay has forfeited this claim by failing to address it.  In any event, a contention that Clay's termination was related to her age would lack merit for the same reasons her FMLA retaliation claim falls short.

**D.      Title VII claim**

Clay's Title VII claim arises from her contention that Amtrak retaliated against her for voicing opposition to management's directive to attempt to discourage employees from filing discrimination complaints with outside federal and state agencies. To succeed on a Title VII retaliation claim, a plaintiff must establish that she engaged in activity protected by the statute, her employer took a materially adverse action against her, and there is a causal connection between these events.  *See, e.g., Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016).

Amtrak's primary argument is that Clay did not engage in protected activity. The Court is not so sure. A practice of discouraging employees who have a choice of complaining about discrimination internally or externally from filing outside complaints might be interpreted by employees as discouraging them from making complaints, period.

But even if one assumes that Clay engaged in protected activity, she has not offered evidence from which a reasonable jury could infer a causal connection between her complaint (either this one or her complaint about the webinar and copyright infringement) and her termination. First, there is no suspicious timing. Clay says that the directive from Nelson-Burney came in December 2013-January 2014, and Clay was not terminated until May 21, 2014. *See, e.g., Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (four-month time gap insufficient to establish causal connection without additional evidence). Second, Clay has not attempted to identify any comparable employee who did not voice complaints and was treated better than she was. Third, Clay identifies no other evidence that might suggest retaliatory behavior by Amtrak, such as shifting justifications for her termination, varying from its usual procedures, or trumping up a phony basis for the discharge.

**E.      Retaliatory discharge claim**

Clay also asserts a state-law retaliatory discharge claim. Retaliatory discharge in Illinois is a "narrow exception" to the general rule that an at-will employee may be discharged at any time for any reason. *Michael v. Precision All. Grp., LLC*, 2014 IL 117376, ¶ 28, 21 N.E.3d 1183, 1188. To sustain a claim of retaliatory discharge, an employee must prove that the employer discharged the employee, in retaliation for the

employee's activities (causation), contrary to a clear mandate of public policy.  *Id.* ¶ 29, 21 N.E.3d at 1188.  The Illinois Supreme Court has recognized that an employer discharging an employee for "whistleblowing" violates the State's public policy.  *Id.* ¶ 30, 21 N.E.3d at 1188.

Clay argues, as she did on her First Amendment and Title VII claims, that Amtrak discharged her in retaliation for her decision to speak out against Amtrak's allegedly illegal conduct.  As discussed in earlier sections of this decision, no reasonable jury could find that Amtrak terminated Clay because of her opposition to its employment discrimination policies and or the webinar issue.  Amtrak is entitled to summary judgment on this claim as well.

**F.    Illinois Whistleblower Act claim**

Amtrak also seeks summary judgment on Clay's claim under the Illinois Whistleblower Act, arguing that Clay cannot show that Amtrak terminated her employment for her refusal to engage in illegal conduct.  Section 20 of the IWA prohibits an employer from retaliating against an employee for refusing to participate in activity that would result in violation of state or federal law, rule, or regulation.  740 ILCS 174/20.  Even without an actual violation of law, "if an employee had reasonable cause to believe there was a violation of a state or federal law, rule or regulation, and she disclosed that to a governmental agency, she is protected from any employer retaliation by the Whistleblower Act."  *Willms v. OSF Healthcare Sys.*, 2013 IL App (3d) 120450, ¶ 14, 984 N.E.2d 1194, 1196.

Clay did not refuse to participate in Amtrak's allegedly illegal practices.  Clay concedes that she went along and encouraged employees to file internal complaints

instead of external complaints and probed those employees who opted to file an external complaint.  Likewise, Clay admitted to participating in the webinar that involved the allegedly violation of copyright laws.  Moreover, Clay has offered no evidence that she attempted to actually blow the whistle on Amtrak's actions.  She does not contend that she informed anyone outside her department, let alone outside of Amtrak that she believed the company was engaged in illegal activity.

For these reasons, no reasonable jury could find in Clay's favor on her claim under the IWA.

## G.    Intentional infliction of emotional distress claim

To sustain an IIED claim, Clay must show that: (1) Amtrak's conduct toward her was "extreme and outrageous," (2) Amtrak "intended or recklessly disregarded the probability that [its] conduct would cause [her] to suffer emotional distress," (3) she endured "severe or extreme" emotional distress, and (4) Amtrak's conduct "actually and proximately" caused her distress.  *See Ulm v. Mem'l Med. Ctr.*, 2012 IL App (4th) 110421964, ¶ 39, 964 N.E.2d 632, 641.

Extreme and outrageous behavior is defined as conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.*, ¶ 40, 964 N.E.2d at 642 (internal quotation marks omitted).  Clay does not offer evidence of any conduct that meets this definition.  In her summary judgment response brief, Clay identifies three purportedly extreme and outrageous actions:  (1) Nelson-Burney's purported "coercion" of her to participate in dissuading Amtrak employees from filing external EEO complaints; (2) Peterkin's direction to participate in a webinar in a way that she believed violated copyright laws; and (3) the termination of her

employment.  Clay overstates the first two of these points.  She offers no real evidence of "coercion" as such; rather, she cites Nelson-Burney's direction to EEO officers to "do what I tell you to do" after officers complained about the effort to discourage external EEO complaints.  Pl.'s Resp. Ex. 6 (Munoz Dep.) at 41:14-42:2.  Clay has not identified "coercive" activity that was directed at her individually.  Second, calling Peterkin's direction to Clay to participate in the webinar "extreme" or "outrageous" would be a significant stretch, particularly when Clay points to no evidence that Peterkin was aware that Clay was opposed to participating.  Finally, absent unusual circumstances that are not present here, termination of employment alone does not sustain a claim for intentional infliction of emotional distress.  Illinois courts "are concerned that, if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action."  *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 746, 742 N.E.2d 858, 867 (2000).  Amtrak is entitled to summary judgment on this claim as well.

### Conclusion

For the reasons stated above, the Court grants Amtrak's motion for summary judgment [dkt. no. 55] and directs the Clerk to enter judgment in favor of defendants.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  December 20, 2016